**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **SCOTT GAGNON,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **A-11-CV-920-LY** |
| | § | |
| **HYATT CORPORATION,** | § | |
| | § | |
| **DEFENDANT.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

Before the Court are Defendant Hyatt Corporation's Motion for Summary Judgment, filed November 1, 2012 (Clerk's Dkt. #26); Plaintiff's Response to Defendant's Motion for Summary Judgment, filed November 13, 2012 (Clerk's Dkt. #27); Notice of Filing of Evidence in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, filed November 14, 2012 (Clerk's Dkt. #30); Defendant Hyatt Corporation's Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment, filed November 26, 2012 (Clerk's Dkt. #33); Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment, filed January 9, 2013 (Clerk's Dkt. #40); and Defendant Hyatt Corporation's Reply to Plaintiff's Supplemental Response to Defendant's Motion for Summary Judgment, filed January 28, 2013 (Clerk's Dkt. #45).

The motion was referred by United States District Judge Lee Yeakel to the undersigned for a Report and Recommendation as to the merits of the motions pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. After reviewing the parties' pleadings,

relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court.

## I.  BACKGROUND

Hyatt Corporation ("Hyatt") fired Scott Gagnon ("Gagnon"), an autistic laundry attendant, after he had worked for Hyatt for sixteen years. Gagnon claims that, at the time of his termination, he had been attempting, unsuccessfully, to obtain an accommodation for his autism for one-and-a-half years. Gagnon argues Hyatt discriminated against him, failed to accommodate his requests, and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12001, *et seq*. and the Texas Commission on Human Rights Act, Texas Labor Code § 21.001, *et seq*. ("TCHRA").

Hyatt now moves for summary judgment arguing there is no genuine, material issue of fact warranting a trial on Gagnon's claims of discrimination, failure to accommodate, and retaliation in violation of the ADA and the TCHRA. The parties have filed responsive pleadings and the matter is now ripe for determination.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the movant shows there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254,106 S. Ct. 2505, 2513 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S. Ct. 1348, 1355–56 (1986); *Wise v. E.I. Dupont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir. 1995). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir. 1992).

The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 110, 122 (1993). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Id*.

### III. RELEVANT FACTS

Gagnon is a thirty-nine year old man who worked as a laundry attendant in the laundry room of the Hyatt Regency hotel located in Austin, Texas ("Hyatt Regency Austin"). Gagnon was initially hired by Hyatt as a laundry attendant on March 2, 1995. (Clerk's Dkt. #26, Ex. A at 23-24). At the time he was hired, Gagnon was given a complete copy of Hyatt policies, including the Unacceptable Behavior policy. (*Id.* at 25-26, 28).

From 1995 to 2011, Gagnon received 21 performance evaluations, scoring meets expectations/standards on 17 of them and exceeds expectations on 2 of them. (Clerk's Dkt. #30, Ex. C-W). Gagnon received special commendations for his performance, including being named

Superstar of the Month in July 1999 and being nominated as a Superstar in December 2001. (Clerk's Dkt. #30, Ex. X and Y).

Beginning in June 2009, Gagnon began reporting to Laundry Supervisor Maria Ramirez ("Ramirez"), who remained his direct supervisor through the end of his employment. (Clerk's Dkt. #26, Ex. C at 32). Ramirez in turn reported to Executive Housekeeper Erika Arispe ("Arispe"). (Clerk's Dkt. #26, Ex. D at 28). Kefren Greenstreet ("Greenstreet") has served as the Director of Human Resources at the Hyatt Regency Austin since 2006. (Clerk's Dkt. #26, Ex. B at 8).

Hyatt maintains a progressive discipline policy that increases penalties for cumulative disciplinary infractions. Greenstreet testified that Hyatt "followed steps of progressive discipline ... in an attempt to correct [Gagnon's] behavior." (Clerk's Dkt. #30, Ex. KK at 68). Greenstreet stated that employees will occasionally get a reset on the progressive discipline because Hyatt "look[s] at, roughly, a rolling year from the date of [a disciplinary] occurrence." (Clerk's Dkt. #26, Ex. B at 119). When asked how frequent the progressive discipline must be for an employee to be terminated, Greenstreet stated that "the progressive discipline kind of resets ... based off of what has occurred in that period of time" but "[e]ach situation is different and reviewed on a case-by-case basis." (Clerk's Dkt. #30, Ex. KK at 70). During his employment at Hyatt, Gagnon received several disciplinary write-ups:

| Date | Discipline Type | Reason Cited |
|------|-----------------|--------------|
| 5/16/1995 | Verbal Warning | Disrespect to Supervisors |
| 2/29/1996 | Verbal Warning | Grooming Below Standards |
| 7/21/1997 | Written Warning | Unprofessional Conduct |
| 9/5/1997 | Final Warning | Violation of Rules/Damaged Equipment |
| 4/28/1998 | Written Warning | Performance Below Standards |

| | | |
|---|---|---|
| 9/14/1998 | Written Warning | Hitting Equipment |
| 6/26/1999 | Written Warning | Unprofessional Language |
| 3/5/2004 | Verbal Warning | Unprofessional Behavior |
| 1/30/2008 | Written Warning | Hit Machine/Unprofessional Behavior |
| 10/1/2009 | Suspension | Unprofessional Behavior/Disrespectful |
| 1/29/2010 | Verbal Warning | Working Slowly/Low Production |
| 7/26/2010 | Final Warning | Unprofessional Conduct |
| 11/9/2010 | Final Warning | Unprofessional Conduct<br>(Hyatt agreed to request for Goodwill coach)<br>(Began using Performance Checklist as requested) |
| 3/7/2011 | Termination | Unprofessional Conduct |

(Clerk's Dkt. #26, Ex. A at Internal Ex. 2-13).

The present issue relates to Gagnon's October 2009, July 2010, November 2010, and March 2011 disciplinary write-ups for unprofessional conduct which were issued after it is alleged Hyatt was informed of his autism. It is disputed as to whether Hyatt was aware of Gagnon's autism. Ramirez and Arispe stated that they were not aware of Gagnon's autism and both considered him fully capable of performing his job duties. (Clerk's Dkt. #26, Ex. C at 33-36, 78-81; Ex. D at 16-18, 100-104). Greenstreet similarly stated she was unaware of Gagnon was diagnosed with autism. (Clerk's Dkt. #26, Ex. B at 44-46).

However, Gagnon's father, Armand Gagnon, stated that "[o]n multiple occasions, [he] informed Scott Gagnon's supervisors and individuals in human resources that Scott Gagnon is autistic and disabled."[1] (Clerk's Dkt. #30, Ex. LL). Specifically, Armand Gagnon stated he informed

---

[1]Plaintiff's Response to the Motion for Summary Judgment states Armand Gagnon told Ramirez, Arispe, and Greenstreet that Gagnon was disabled and autistic; however, Armand Gagnon's cited deposition does not specify these individuals.

Gagnon's supervisors of Gagnon's autism and disability on the phone in October 2009, in person in July 2010, and in person in November 2010. (*Id.*).

According to Gagnon's October 1, 2009 disciplinary write-up, Gagnon was suspended for unprofessional conduct and being disrespectful as he referred to Ramirez as a "bitch." (Clerk's Dkt. #26, Ex. A at Internal Ex. 6 and at 66). During the October 2009 telephone conversation between Hyatt and Armand Gagnon, Armand Gagnon informed:

> one of Scott Gagnon's supervisors on the phone ... that Scott Gagnon was autistic and disabled. [Armand Gagnon] requested that the Hyatt accommodate Scott Gagnon's disability by assigning him to work only on the laundry machines that he can successfully operate.

(Clerk's Dkt. #30, Ex. LL). Armand Gagnon stated that Gagnon's supervisor responded that Gagnon had to work on all the machines. (*Id.*).

According to Gagnon's July 26, 2010 disciplinary write-up, Gagnon received a Final Warning for unprofessional conduct on July 25, 2010 for telling Ramirez to "shut up" when she reminded him to work at a steady pace and slamming a set of heavy double doors when leaving the work area. (Clerk's Dkt. #26, Ex. A at Internal Ex. 8-9). That Final Warning unequivocally informed Gagnon that "any further infractions of the above nature will result in disciplinary action, up to and including the termination of employment." (*Id.*). A Hyatt document, dated July 25, 2010, states that on that day Gagnon, Armand Gagnon, Ramirez, Arispe, and Kefren met to discuss Gagnon's failure to perform work assignments and his inappropriate outburst:

> Discussed concerns from Sunday. Discussed failure to perform work assignments and inappropriate outburst. Scott acknowledged both situations took place and apologized for the scenario.
>
> Scott's father asked about Scott feeling pushed too much. Maria went on to explain the delay of 2 hours in completing assignments. We discussed manner and tone of Maria's direction being kind and pleasant. Scott acknowledged this as being accurate.

> Discussed expectations of how Scott conducts himself and discussed previously [sic] [Final Written Warning] and 3 day suspension.
>
> Maria shared suggestions previously provided to Scott regarding taking a break outside if he is feeling frustrated / pushed. Scott said he too goes to get drinks from the café. Reiterated need for Scott to do this in order to maintain expected demeanor at work.
>
> Scott is aware he is on final notice.

 (Clerk's Dkt. #26, Ex. A at Internal Ex. 9).

Armand Gagnon states that, during this meeting, he requested that Hyatt accommodate Gagnon's disability by not requiring him to work on the towel folding machine. (Clerk's Dkt. #30, Ex. LL). Gagnon had a history of disciplinary write-ups in relation to his frustration while operating the towel folding machine. Specifically, Gagnon was written up in September 1997 after "becoming very annoyed with the folder," in April 1998 when the Hyatt was "having problems with the folders," and in September 1998 after he "was very upset with the folders." (Clerk's Dkt. #30, Ex. MM-OO).

Gagnon was given another Final Warning on November 9, 2010 for his failing to complete his job assignment on November 4, 2010 after given clear direction from his manager and for failing to communicate in a professional manner with his manager throughout the day. (Clerk's Dkt. #26, Ex. A at Internal Ex. 10). Specifically, Gagnon cursed to Arispe that "the f—ing folders" weren't working. (Clerk's Dkt. #26, Ex. B at 79-80 and Internal Ex. 18, 19). Gagnon admitted in his deposition that he "was really fully out of line" and would not repeat the profanity because "I can't mention it in front of a live microphone." (Clerk's Dkt. #26, Ex. A at 92). Instead of discharging Gagnon for his misconduct in November 2010, Hyatt agreed to his requests to bring in job coaches from Goodwill and to create a daily checklist of assignments. (*Id.* at 72-73. 83; Clerk's Dkt. #26, Ex. A at Internal Ex. 11).

Armand Gagnon states that, during the November 2010 meeting between Armand Gagnon, Gagnon, and Gagnon's supervisors, Armand Gagnon requested that Hyatt accommodate Gagnon's disability by assigning him to work on machines he was better at operating and not on machines that gave him trouble. (Clerk's Dkt. #30, Ex. LL). Armand Gagnon states that, despite this request, Hyatt continued to schedule Gagnon to work on the towel folding machine, including in the months leading up to his termination. (Clerk's Dkt. #30, Exhibits PP-VV).

On March 2, 2011 Gagnon shoved a large, heavy cart across the floor and into one of the dryers. (Clerk's Dkt. #26, Ex. A at Internal Ex. 13; Ex. C at 39-41; Ex. D at 91). Other employees came to Ramirez after that outburst to report that Gagnon had done the same thing on other occasions and to express concern over the safety of his actions. (Clerk's Dkt. #26, Ex. C at 39-41). Gagnon was sent home early on March 3, 2011 while Human Resources investigated. During the investigation, Arispe notified Greenstreet that Gagnon had been cursing loudly about the time clock. (Clerk's Dkt. #26, Ex. A at Internal Ex. 13 at 2). Arispe noted that from her office she could hear Gagnon "yelling and cursing at the timeclock" two to three times a week with phrases like "don't start this shit again" and "god damn thing." *(Id.)*.

Citing the combination of Gagnon's history of outbursts, his multiple warnings and counseling, and the lack of improvement in his behavior, Greenstreet made the decision to terminate Gagnon's employment on March 7, 2011. (Clerk's Dkt. #26, Ex. B at 44-45, 62-63, 88-89).

## V. DISCUSSION

Gagnon alleges discrimination, failure to provide reasonable accommodations, and retaliation in violation of the TCHRA and the ADA. When applying the THCRA, Texas courts and federal diversity courts "look to analogous federal precedent for guidance when interpreting the Texas Act."

*Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 473–474 (5th Cir. 2006). In evaluating

TCHRA disability claims, the Fifth Circuit has"focused on those analogous federal precedents and

their interpretation of the federal act banning discrimination in employment on the basis of disability:

the ADA." *Id.* at 474. Accordingly, the Court will treat the TCHRA claims as identical to the ADA

claims for the purposes of determining whether summary judgment will be granted.

**A.    Discrimination**

Gagnon alleges Hyatt intentionally discriminated against Gagnon because of his disability

in violation of the ADA by terminating Gagnon's employment. (Clerk's Dkt. #12 ¶6.12).

Specifically, Gagnon alleges his disability and/or being regarded as disabled was a determining or

motivating factor in Hyatt's decision to terminate Gagnon's employment.

The ADA provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

In employment discrimination cases relying on circumstantial evidence, as in this one, ADA claims

are analyzed under the *McDonnell Douglas* framework. *E.E.O.C. v. Chevron Phillips Chemical Co.,*

*LP*, 570 F.3d 606 (5th Cir. 2009).

Under the *McDonnell–Douglas* framework, the plaintiff-employee has the initial burden to

make a prima facie showing of discrimination or retaliation. *McInnis v. Alamo Cmty. College Dist.*,

207 F.3d 276, 279–80 (5th Cir. 2000). Once the plaintiff-employee makes this showing, the burden

shifts to the defendant-employer to articulate a legitimate, nondiscriminatory or non-retaliatory

reason for the adverse employment action. *Id.* at 280. Once the defendant-employer articulates such

a reason, the burden shifts back to the plaintiff-employee to offer sufficient evidence to create a

genuine dispute that the defendant-employer's reason was either: (1) a mere pretext for unlawful discrimination or retaliation; or (2) true, but only one of the reasons for its conduct, and another motivating factor is the plaintiff-employee's protected characteristic. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir.2004).

To establish a prima facie case of discrimination under the ADA, Gagnon must establish that: (1) he has a disability; (2) he is qualified for the position in question; and (3) he was discriminated against because of a disability as defined in the ADA. *Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 222 (5th Cir. 2011) (citing *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007)).

Hyatt neither disputes Gagnon's disability nor his qualification for the position but argues there is insufficient evidence to find that Gagnon has been discriminated against because of a disability. Hyatt first argues there is no evidence that Gagnon was regarded as disabled by Hyatt and thus could not have been discriminated against because of his disability. Ramirez, Arispe, and Greenstreet all claimed that they were not aware that Gagnon was disabled. (Clerk's Dkt. #30, Ex. BBB at 33-36, 78-81; CCC at 16-18, 100-104; and KK at 43).

Gagnon responds that his father, Armand Gagnon, stated that "[o]n multiple occasions, [he] informed Scott Gagnon's supervisors and individuals in human resources that Scott Gagnon is autistic and disabled." (Clerk's Dkt. #30, Ex. LL ¶2). Specifically, Armand Gagnon stated he informed Gagnon's supervisors of Gagnon's autism and disability on the phone in October 2009, in person in July 2010, and in person in November 2010. (*Id.* ¶¶3–5). Thus, there is a question of fact as to whether Gagnon was regarded as disabled by Hyatt and could have been discriminated against because of his disability.

Hyatt further argues that, even if Gagnon were regarded as disabled by Hyatt, there is no evidence that Hyatt discriminated against Gagnon because of his disability. (Clerk's Dkt. #26 at 12). Specifically, Hyatt argues that the evidence shows Gagnon's employment was terminated due to behavior issues. In response, Gagnon offers two arguments to demonstrate his disability was a motivating factor in Hyatt's decision to terminate his employment: (1) in the past Gagnon had been disciplined for the same behavior that led to his termination but was not terminated; and (2) Hyatt failed to consistently apply its progressive discipline policy to Gagnon and non-autistic employees.

Regarding Gagnon disciplinary history, Gagnon points out that his past disciplinary write-ups were for similar behavior issues but he was not terminated. Specifically, Gagnon points out that he had been disciplined for swearing, unprofessional behavior, failure to perform work assignments satisfactorily, and hitting the machines in the laundry room in 1995, 1996, and 1997 but did not get terminated. (Clerk's Dkt. #30, Ex. CC-JJ). In fact, Gagnon points out that his performance reviews from 1996 to 2010 show his performance did not deviate from "meets expectations/standards" during those fourteen years. (Clerk's Dkt. #30, Ex. F-V).    Hyatt replies that Gagnon was ultimately terminated because of his consecutive disciplinary problems in accordance with its progressive discipline policy. Specifically, Greenstreet testified that Hyatt "followed steps of progressive discipline ... in an attempt to correct [Gagnon's] behavior." (Clerk's Dkt. #30, Ex. KK at 68). Thus, even if Hyatt did not terminate Gagnon for similar behavior in the past, this is consistent with a progressive discipline policy in which an employee is only terminated after consecutive disciplinary infractions.

Moreover, Gagnon essentially argues that he was not terminated in the past for disciplinary problems but was terminated in 2011 because Hyatt then knew of his disability. However, Gagnon

11

alleges Hyatt knew of his disability as early as October 2009, yet in November 2010—after Hyatt had already issued Gagnon a final written warning in July 2010—Hyatt chose not to terminate Gagnon despite his admitted behavior problems. Instead, they agreed to his requests to bring in job coaches from Goodwill and to create a daily checklist of assignments. Only after Gagnon again demonstrated unprofessional conduct in March 2011 did Hyatt decide to terminate him. Based on this history of discipline, the disparate disciplinary actions taken in response to Gagnon's admitted multiple incidences of unprofessional behavior fails to demonstrate discrimination on the basis of Gagnon's disability.

Gagnon next argues that Hyatt inconsistently applied the progressive discipline policy to Gagnon as compared with other non-autistic employees, demonstrating disability discrimination. Specifically, Gagnon argues his disciplinary write-ups inconsistently included his disciplinary history. Gagnon points out his October 1, 2009 suspension was imposed without any prior disciplinary history being listed on his discussion write-up. (Clerk's Dkt. #30, Ex. CC and KK at 77:18-78:5). Similarly, on July 26, 2010 Gagnon was given a "Final Warning" without any prior discussion history being listed. (Clerk's Dkt. #30, Ex. EE). Gagnon further points out on November 9, 2010 he received a Final Warning on a disciplinary write-up that included a list of three prior disciplinary actions; however, this list included a disciplinary action from October 1, 2009, which was more than a year prior. (Clerk's Dkt. #30, Ex. FF).

In response, Hyatt argues that the only evidence concerning the progressive discipline policy—Greenstreet's deposition—demonstrates that the policy is flexible and allows for considering the circumstances of each incident. When asked how frequent the progressive discipline must be for an employee to be terminated, Greenstreet stated that "the progressive discipline kind of resets ...

based off of what has occurred in that period of time" but "[e]ach situation is different and reviewed on a case-by-case basis." (Clerk's Dkt. #30, Ex. KK at 70). Greenstreet stated that employees will occasionally get a reset on the progressive discipline because Hyatt "look[s] at, roughly, a rolling year from the date of [a disciplinary] occurrence." (Clerk's Dkt. #26, Ex. B at 119). This is a common sense approach as the severity of infractions may entail differing levels of disciplinary action. For example, it is reasonable that Hyatt should suspend Gagnon for calling his supervisor a "bitch" even though he had not previously done so. In this situation, his disciplinary write-up would not include a disciplinary history of prior warnings.

Since the only evidence concerning the progressive discipline policy states that it is a flexible policy, the varied inclusion of prior discussion history in Gagnon's disciplinary write-ups and the fourteen month prior discussion history in the November 9, 2010 write-up neither confirms nor excludes the possibility that Hyatt discriminated against Gagnon on account of his disability. The fact that Hyatt chose not to terminate Gagnon for unprofessional conduct in November 2010 after his July 26, 2010 Final Warning and the fact that Hyatt instead opted to bring in job coaches and create a daily checklist of assignments to assist Gagnon belies his claim that Hyatt's disciplinary actions discriminated against him—particularly since he does not contest any of the behavior that resulted in his disciplinary write-ups. Moreover, if the undersigned accepted Gagnon's unsupported assertion that Hyatt's policy is a strictly enforced one, it would seem Hyatt departed from its policy in Gagnon's favor, even after Gagnon's father allegedly informed Hyatt of Gagnon's autism.

Even if Gagnon had successfully demonstrated that Hyatt violated its own procedures and policies in terminating him, Gagnon would still need to establish the existence of discrete facts that show some nexus between the termination and his disability. *Moore v. Eli Lilly & Co.*, 990 F.2d

812, 819 (5th Cir. 1993); *see also Sanchez v. Texas Comm'n on Alcoholism*, 660 F.2d 658, 662 (5th Cir. 1981) (an employer's disregard of its own hiring system does not prove discrimination absent a showing that discrimination was a motive in the action taken); *Lerma v. Bolger*, 689 F.2d 589, 592 (5th Cir. 1982) ("failures to 'follow the book' " held "not persuasive" where no showing that the failure generally "produced disparate results").

To demonstrate some nexus between the termination and his disability, Gagnon argues he was treated differently than his colleagues with regard to discipline. As evidence of disparate treatment, Gagnon argues that Hyatt "rolled off" disciplinary write-ups for its non-autistic employees much sooner than twelve months. Specifically, Sevastian Pearla ("Pearla"), a non-autistic laundry attendant, received write-ups on July 3, September 16, and September 22, 2008; however, Hyatt did not include prior disciplinary history on Pearla's September 16 or September 22 employee disciplinary write-ups. (Clerk's Dkt. #40, Ex. C, D, and E). Gagnon points out that Pearla was not terminated by Hyatt despite receiving multiple disciplinary write-ups in a one year period:

| Date | Discipline Type | Reason Cited |
|------|-----------------|--------------|
| 8/17/2007 | Verbal Warning | Failure to complete assigned project |
| 9/1/2007 | Verbal Warning | Failure to follow instructions |
| 10/8/2007 | Written Warning | Failure to follow instructions |
| 5/25/2008 | HR Discussion | Failure to follow instructions |
| 7/3/2008 | Verbal Warning | Accident with Chemical |
| 9/14/2008 | Verbal Warning | Failure to work a shift as scheduled |
| 9/22/2008 | Verbal Warning | Low productivity |

(Clerk's Dkt. #40, Ex. C, D, E, I, J, K, and L).

Hyatt replies that the Pearla's disciplinary write-ups on July 3, September 16 and September 22, 2008 each involved different forms of performance issues. Hyatt states that progressive discipline is for repetition of the same performance problem, and, since Pearla's problems were not of the same nature, they were not cumulative. As evidence in support of this contention, Hyatt points out that Pearla was disciplined progressively for repeated offenses on September 1, 2007 (verbal warning), October 8, 2007 (written warning), and May 25, 2008 (HR Discussion). Similarly, Gagnon's disciplinary actions increased in severity as he displayed unprofessional conduct and disrespect for his supervisor on consecutive occasions from 2009 to 2011. Consistent with Hyatt's explanation, Gagnon's January 29, 2010 disciplinary write-up for working too slowly resulted in a verbal warning as it was not a consecutive issue—unlike the unprofessional conduct problems that were on-going at that time. Given the only evidence regarding Pearla's discipline history is consistent with a progressive discipline policy, the undersigned concludes that Pearla's disciplinary actions do not demonstrate evidence of disparate treatment.

Gagnon also points out that Maria Elena Sanchez ("Sanchez"), a non-autistic laundry attendant, was written up on July 25, 2008, September 4, 2008 and September 6, 2008; however, Hyatt did not include prior disciplinary history on either the July 25, 2008 or September 4, 2008 disciplinary write-ups.[2] (Clerk's Dkt. #40, Ex. F, G, and H). The July disciplinary write-up was for absenteeism and the two September write-ups were for Failure to Follow Procedures and Failure to Follow Instructions. Thus, the September 4, 2008 write-up was not a repeat offense and the September 6, 2008 write-up was a repeat offense. Accordingly, the prior disciplinary history was

---

[2] Gagnon mistakenly refers to these write-ups as a July 25, 2008 write-up and two September 6, 2008 write-ups. He also erroneously portrays the two September write-ups as both lacking any mention of disciplinary history.

included in the September 6, 2008 write-up. (Clerk's Dkt. #40, Ex. G and H). Given the only evidence regarding Sanchez's discipline history is consistent with a progressive discipline policy, the undersigned concludes that Sanchez's disciplinary actions do not demonstrate evidence of disparate treatment.

Given the lack of evidence demonstrating a nexus between Gagnon's termination and his disability, the undersigned concurs with Hyatt that there is no genuine, material issue of fact as to whether Gagnon was discriminated against because of a disability. Accordingly, summary judgment should be granted in regard to Gagnon's ADA discrimination claim.

**B.      Failure to Provide Reasonable Accommodation**

Gagnon also claims Hyatt violated the ADA by refusing to provide him reasonable accommodation. (Clerk's Dkt. #12 ¶6.13).

> The ADA requires covered entities, including private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship."

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). "When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009). "The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th. Cir. 2011) (quoting *E.E.O.C.*, 555 F.3d at 471).

Gagnon's complaint states that Gagnon and his father "requested that [Gagnon] be accommodated by allowing him to switch between tasks in the laundry room and by having expectations and instructions explained to him in a manner an individual with autism could understand." (Clerk's Dkt. #12 ¶5.5). However, the only evidence Plaintiffs identify that relates to this request for accommodation is Armand Gagnon's declaration that he requested and Hyatt refused to accommodate Gagnon's disability by assigning him to work only laundry machines he could successfully operate and not assigning him to machines that gave him trouble including the towel folding machine. (Clerk's Dkt. #30, Ex. LL ¶3-5). Notably, Armand Gagnon does not state whether he offered any medical evidence of autism or described with any detail why Gagnon could work some machines but not others in the laundry room and how this related to autism. Additionally, no evidence is identified demonstrating a request to have instructions explained in a manner an individual with autism could understand.

While Gagnon did not receive the accommodation he allegedly requested, the ADA does not require Hyatt to provide whatever accommodation is requested. *See Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 316 (5th Cir. 2007) ("A disabled employee has no right ... to choose what job to which he will be assigned..."). Instead, the ADA requires the employer to engage in flexible, interactive discussions to determine the appropriate accommodation. While it remains a question of fact as to whether Hyatt was aware of Gagnon's autism or whether Gagnon or his father made requests for accommodation on the basis of Gagnon's autism, it is undisputed that Hyatt discussed accommodating Gagnon's behavioral problems at work. Indeed, Gagnon's own pleading states that "Hyatt made several attempts [to] provide what they considered appropriate accommodations," but "they dismissed [Gagnon's] requested accommodation to not operate the towel folder out of hand,

stating that [Gagnon] was required to work on all the machines in the laundry room." (Clerk's Dkt. #27 at 8).

Hyatt argues that, to the extent Gagnon requested an accommodation, it engaged in flexible, interactive discussions to determine the appropriate accommodation as demonstrated by a number of efforts. First, Greenstreet "recommended to Scott that if he was starting to become frustrated, to step away from his work area in order to calm down." (Clerk's Dkt. #26, Ex. B at 72-73.) Second, Hyatt allowed Gagnon to involve his father in work-related discussions. (*Id.*) Third, as Gagnon indicated that he worked better when he worked the same shifts as Ramirez, Hyatt attempted to schedule him to work with Ramirez as much as possible and even offered Gagnon the opportunity to go part-time to guarantee he would always work with Ramirez. (*Id.*) Fourth, Hyatt agreed, upon Gagnon's request, to permit the involvement of a "job coach" from Goodwill in November and December of 2010. (*Id.*) Fifth, Hyatt created a checklist to assist Gagnon with completing the duties of his job and remaining on task as he requested. (Clerk's Dkt. #26, Ex. A at Internal Ex. 11.) Sixth, instead of discharging Gagnon in November 2010 for misconduct at a time when he was on Final Warning, Hyatt continued the progressive discipline process.

In the present case, there is clear evidence that Hyatt engaged in accommodation discussions and made multiple efforts to accommodate Gagnon's difficulties at work. According to Armand Gagnon, Gagnon and Hyatt engaged in discussions about his autism and his requests for accommodation in October 2009, July 2010, and November 2010. After informing the Gagnons that Gagnon would have to work all the machines in the laundry room in these discussions, in November 2010 Hyatt chose to bring in job coaches from Goodwill and to create a daily checklist of assignments to assist Gagnon. (*Id.* at 72-73. 83; Clerk's Dkt. #26, Ex. A at Internal Ex. 11). This

series of discussions cannot be considered a breakdown in the interactive process merely because Hyatt refused Gagnon's preferred accommodation. Based on Armand Gagnon's declaration, it appears these discussions continued on and off for over a year at least until November 2010 when Hyatt decided to accommodate Gagnon's request for job coaches and a daily checklist of assignments.

Given the abundant evidence of flexible, interactive accommodation discussions as well as accommodations, Gagnon has failed to produce sufficient evidence to demonstrate Hyatt failed to satisfy the ADA's requirement that it engage in flexible, interactive discussions to determine an appropriate accommodation. Accordingly, summary judgment should be granted with regard to Gagnon's claim for a failure to accommodate.

## C.    Retaliation

Gagnon finally alleges Hyatt violated the ADA by retaliating against Gagnon for making discrimination complaints, for requesting reasonable accommodations, for participating in a discrimination investigation or otherwise opposing disability discrimination by the employer. (Clerk's Dkt. #12 ¶6.14). However, no evidence is provided that Gagnon made any discrimination complaints or participated in any discrimination investigations prior to his termination. To prevail on his ADA retaliation claim, Gagnon must establish that: (1) he engaged in an activity protected under the ADA; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999).

Hyatt argues Gagnon cannot establish that he engaged in activity protected under the ADA. However, Gagnon has presented evidence that Gagnon's father requested accommodations for

Gagnon in meetings with Gagnon and his supervisors, and Gagnon argues a request for accommodations qualifies as a "protected activity" for the purposes of a retaliation claim. Hyatt fails to explain why such a request would not qualify as a "protected activity." As a consequence, Gagnon has produced sufficient evidence to establish a "protected activity" within the meaning of the ADA to survive summary judgment. *See Jenkins v. Cleco Power LLC*, 487 F.3d 309, 317 n. 3 (5th Cir. 2007) (Plaintiff alleged retaliation because employer terminated him for requesting reasonable accommodations and the Fifth Circuit held he engaged in a protected activity).

Concerning adverse employment actions, "[a]n adverse employment action is any action that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Gagnon characterizes both the disciplinary write ups and the termination as adverse employment actions. (Clerk's Dkt. #27 at 10). However, Hyatt treats only the termination as an adverse employment action. (Clerk's Dkt. #33 at 4). In an abundance of caution, the undersigned will treat both the disciplinary write-ups and the termination as adverse employment actions for the purpose of summary judgment.

Hyatt argues Gagnon cannot sufficiently demonstrate that a causal link exists between the requests for accommodation and Gagnon's disciplinary write-ups or termination. "[T]he existence of a causal link between protected activity and an adverse employment action is a 'highly fact specific' and difficult question." *Smith v. Xerox Corp.*, 371 Fed.Appx. 514 (5th Cir. 2010) (quoting *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994)). The Fifth Circuit has held "that indicia of causation may be seen in factors such as: (1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and

(3) the temporal proximity between the employee's conduct and termination." *Nowlin*, 33 F.3d at 508. Gagnon argues a causal link is demonstrated by the temporal proximity between Armand Gagnon's request for an accommodation for Gagnon and Gagnon's disciplinary write-ups and termination. (Clerk's Dkt. #27 at 10).

The Fifth Circuit has held that "the combination of suspicious timing with other significant evidence of pretext[] can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). However, the Fifth Circuit "has rejected temporal proximity, without more, as a basis for showing causation in retaliation cases." *McDowell v. Home Depot USA, Inc.*, 126 Fed.Appx. 168, 170 (5th Cir. 2005) (citing *Swanson v. General Services Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).

As discussed above, neither Gagnon's clearly problematic past discipline record nor Hyatt's application of its progressive discipline policy demonstrate evidence of discrimination on the basis of disability. Thus, Gagnon's only argument concerning a causal connection between his alleged protected activity and adverse actions is temporal proximity. (Clerk's Dkt. #27 at 10). As discussed in *McDowell*, this is insufficient to show causation in retaliation cases. Thus, Gagnon fails to make a prima facie case of retaliation.

Even if Gagnon had made a prima facie case of retaliation, Hyatt has demonstrated a legitimate nondiscriminatory reason for Gagnon's disciplinary write-ups and termination, and Gagnon would need to offer sufficient evidence to demonstrate (1) that the defendant's reason is not true, but is instead a pretext for discrimination or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic. *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Hyatt has produced summary judgment evidence showing that Gagnon engaged in disruptive and unprofessional conduct on the job, and Gagnon does not appear to dispute any of the incidents of misconduct. Thus, Gagnon's escalating outbursts, which disturbed the workplace, were a legitimate non-discriminatory reason for Gagnon's disciplinary write-ups and termination.

In an effort to demonstrate pretext or that retaliation was a motivating factor, Gagnon argues that the behavior for which he was disciplined and terminated had been occurring since the first year of his employment with Hyatt. And yet his performance reviews from 1996 to 2010 showed his performance did not deviate from meeting expectations and standards. Hyatt responds that, while Gagnon had received disciplinary warnings for similar behavior in the past, he had not received so many in such a short amount of time, which warranted termination under their progressive discipline policy.

Gagnon replies that Hyatt's progressive discipline policy cannot be the basis for Gagnon's termination because Hyatt failed to follow its progressive discipline policy. As discussed above, Gagnon has failed to sufficiently demonstrate that Hyatt failed to follow its progressive discipline policy because the only evidence of the policy states it is a flexible policy and Gagnon has failed to demonstrate disparate treatment with comparators. And, as mentioned above, if the progressive discipline policy were strictly interpreted, Hyatt has deviated from that policy to Gagnon's benefit. Specifically, after Hyatt allegedly knew of Gagnon's autism, it chose not to terminate him as would normally be the next step in the progressive discipline policy but chose instead to accommodate his requests for a job coach from Goodwill and a daily checklist of assignments. (*Id.* at 72-73. 83; Clerk's Dkt. #26, Ex. A at Internal Ex. 11).

Thus, even if Gagnon had established a prima facie case of retaliation, he would fail to offer sufficient evidence to demonstrate that the defendant's reason is pretext or that Gagnon's autism was a motivating factor for his disciplinary write-ups or termination. Accordingly, summary judgment should be granted with regard to Gagnon's retaliation claim under the ADA.

## V. RECOMMENDATION

The Magistrate Court **RECOMMENDS** that the District Court **GRANT** Defendant Hyatt Corporation's Motion for Summary Judgment (Clerk's Dkt. #26).

## V. OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150–53, 106 U.S. 466, 472–74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is

ORDERED to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

      **SIGNED** on February 1, 2013.

                              _____

                              MARK LANE
                              UNITED STATES MAGISTRATE JUDGE